UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**KAREN M. TUCKER,**<br><br>a/k/a Kay Tucker,<br>a/k/a Jamie Edwards,<br>a/k/a Melissa Hernandez,<br>a/k/a Nancy Davis,<br>a/k/a Kate Miller,<br>a/k/a Hope Michaels,<br>a/k/a Nikki Nguyen,<br>a/k/a Karen Fisher,<br>a/k/a Carol Davis,<br>a/k/a Ann Nichols, and<br>a/k/a Diane Baker,<br><br>**Defendant** | Criminal Case No. 10-10306-RGS |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Karen Tucker[1] is a con woman. She started conning people at least as early as 1985. She continued conning people through 1980s and kept committing crimes through the 1990s and the 2000s. Her last con targeted people in six cities and lasted three-and-a-half years. Defendant was so good that her husband supposedly had no idea she was running a con, even

---

[1] A/k/a Kay Tucker, Jamie Edwards, Melissa Hernandez, Nancy Davis, Kate Miller, Hope Michaels, Nikki Nguyen, Karen Fisher, Carol Davis, Ann Nichols, and Diane Baker. *See* PSR ¶ 1. Defendant has also gone by Mary Kathryn Rollins, PSR ¶¶ 70, 73; Karen Montgomery, ¶ 72; Lisa Marie Malcolm, PSR ¶ 74; and Karen Marie Kroll, PSR ¶ 79. Other aliases are listed in the PSR's summation of identifying data on the second unnumbered page following page 43. Defendant's various dates of birth and Social Security numbers are listed on the second and third unnumbered pages following page 43.

though he lived with her and opened bank accounts for her.

Prior jail sentences have not convinced Defendant to stop conning people. The only way to prevent her from conning people is to put her in jail for a significant period. Defendant's "psychiatric" evaluation urges the Court to be lenient because Defendant has finally seen the light, which will allow her to confront the supposed issues that compel her to a life of white-collar crime. But the evaluation rests on very thin ice: a three-hour interview with Defendant (whose word must be taken with more than a grain of salt); a telephone interview with Defendant's sister (who has never spoken to the Probation Officer and thus committed herself on any record); a twenty-eight-year-old medical record; and various case- and sentencing-related documents. And the psychiatric evaluation is at odds with the facts: somehow the psychiatrist concluded that Defendant's problems made her "unable to function effectively as a mother, spouse, employee, sister, or stable human being," Evaluation of Dr. Gray at 7, but allowed her to function effectively as an Internet con woman who scammed hundreds of people across the United States, people who, according to the victim impact statements, trusted her until she broke their trust.

Defendant's sentence should punish her, incapacitate her from further crime, and specifically deter her from future crimes. Defendant's sentence should also generally deter potential Internet con artists from attempting similar schemes. For these reasons, the United States moves the Court to sentence Defendant to 65 months of imprisonment, to be followed by 3 years of supervised release; a fine of $10,000, unless Defendant is unable and unlikely to become able to pay a fine even under a reasonable installment schedule; restitution to the victims of $116,713.62; forfeiture of the same amount; and a mandatory special assessment of $200.

The government's recommendation is discussed below in more detail.

## I. DEFENDANT'S CRIMINAL HISTORY

Although sentencing memoranda commonly begin by discussing the offense and the sentencing guidelines, the first thing to consider in this case is Defendant criminal history. Reviewing Defendant's criminal history, which is relevant under 18 U.S.C. § 3553(a), shows that her latest con is a natural progression in a long history of crime.

### *Early Days*

Defendant has been criminally active over three decades. Defendant's first arrest, under a false name for theft of services, came in 1983, almost 30 years ago, when she was 20 years old. PSR ¶ 79. Defendant was arrested again a year later, in 1984, for fraud by check, and apparently extradited to West Virginia for criminal proceedings for which we have no information. PSR ¶¶ 80-81.

Defendant's first con for which we have documentation occurred in early 1985, when at the age of 21, Defendant passed bad checks, forged a name on an access card, and defrauded an innkeeper. PSR ¶¶ 63-64. The crimes sound prosaic, but their execution was anything but. According to the police report, *see* Ex. A, Defendant rented one $720/day three-room suite plus another $200/day hotel room at the Sheraton Premier Hotel in Universal City, California, using an American Express business account that was not hers. Defendant also passed over $10,700 in insufficient funds checks at a clothing store in West Hollywood for clothing and costume jewelry. Ex. A. Defendant told police that she was the president of National Promotions of Commerce City, Colorado, and that the American Express account belonged to her business. Ex. A. Defendant later claimed that the account belonged to a former friend, but the person

identified as her "friend" denied knowing her or allowing her to use his account. Ex. A. Defendant was sentenced to 6 months in jail and 3 years of probation for the bad checks, 16 months for the forgery, and 3 years in prison for defrauding the hotel. She spent about 15 months in prison, was eventually paroled, had her parole revoked five months later, and was then sent back to prison. PSR ¶ 63. She was again paroled, and then violated parole. PSR ¶ 63.

Defendant's next documented con occurred in 1986, at age 23, for taking a vehicle without the owner's consent. PSR ¶ 65. Again, the crime sounds prosaic, but the execution was poetry. According to the arrest reports, *see* Ex. B, Defendant called a car rental agency, gave a false name, claimed to work for Motown Records, and had the agency deliver two new rental cars for two singers with Motown, with Motown to pick up the payments. Defendant fooled the agency into thinking that she worked for Motown by giving them a purchase order number and a phone number, which someone else apparently helped her falsely portray as Motown's number. *See* Ex. B. Defendant received 9 months in jail and 3 years of probation.

From this enterprising start proceeded the rest of Defendant's long history of crime and incarceration:

| Date | Crimes | Punishment | PSR paragraph |
|---|---|---|---|
| Arrested on Feb. 25, 1985 (age 21) | Insufficient funds check; forged name on access card; defrauding an innkeeper; | 6 months in jail; 16 months in prison; 3 years in prison (concurrent) | *See supra* |
| Arrested on Nov. 18, 1986 (age 23) | Taking a vehicle without the owner's consent | 9 months in jail | *See supra* |
| Arrested on Sept. 12, 1988 (age 25) | Forged name on access card (2 counts); | 3 years of prison | 66 |

|  | knowingly receiving stolen property |  |  |
|---|---|---|---|
| Arrested on Sept. 27, 1989 (age 26) | Grand theft of property (3 counts) | 16 months of prison | 67 |
| Arrested on Dec. 2, 1991 (age 28) | Making a false financial statement | 6 years in prison, 6 months to serve, balance suspended for 36 months | 68 |
| Arrested on May 28, 1997 (age 34) | Nonsufficient funds check with intent to defraud | 1-4 years in prison, suspended for 3 years; probation revoked and sentenced to 6 months in jail | 69 |
| Arrested on Nov. 19, 1997 (age 34) | Conspiracy to commit a fraudulent act involving gaming | 12 months in jail | 70 |
| Arrested on Apr. 12, 1999 (age 36) | Petit larceny | $500 fine, later 60 days in jail | 71 |
| Arrested on Jun. 8, 1999 (age 36) | Petit larceny | Time served | 72 |
| Arrested on Aug. 11, 1999 (age 36) | False information to a police officer | Time served | 73 |
| Arrested on Mar. 7, 2000 (age 36) | Burglary | 1-6 years in prison (2½ years served) | 74 |
| Paroled Jan. 8, 2003 (age 39) |  |  | 74 |
| Committed Dec. 2007-July 27, 2010 (ages 44 through 47) | Present offense | TBD | 10 |

This chronology omits a variety of arrests in 1996, 1999, and 2003 that did not result in convictions.  PSR ¶¶ 70-86.

5

***Defendant's Criminal History Category Accurately Represents the Seriousness of Her Criminal Conduct***

This chart demonstrates that Defendant's criminal history category of IV accurately reflects the seriousness of her criminal conduct and thus the probability that she will resume conning people after she leaves prison. Defendant has committed crimes and been in and out of prison in her 20s, her 30s, and her 40s. In each decade of her adult life, she has earned multi-year sentences in prison. After release, she may be good or go undetected for a while, but she always returns to a life of crime. For example, she violated parole and probation in 1986, 1988, 1991, 1993, and 2000. PSR ¶¶ 63, 67, 68, 69. And after her release from prison in 2003, Defendant began her new scheme just four years later.[2]

If past performance is any indicator, Defendant will commit new crimes soon after leaving prison in this case.

## II.   DEFENDANT'S CURRENT, SOPHISTICATED BRIDAL SCAM

Defendant has come a long way since her bad check, forgery, defrauding an innkeeper, and theft of a vehicle days. Her pretense — posing as a legitimate business — has remained unchanged, but her methods for fooling people have become much more sophisticated.

In Defendant's latest con, she posed as a series of businesses and employees of businesses that promoted bridal shows and magazines from December 2007 through July 2010, in Columbus, Ohio; Baltimore, Maryland; Las Vegas, Nevada; Miami, Florida; Boston, Massachusetts; and Dallas-Ft. Worth, Texas. Defendant promised to print victims' ads, let them display their goods and services at the shows, and to perform other services connected the bridal shows. She

---

[2] Actually, one victim indicates that the scheme began in 2006. *See* Victim Impact Statement of C.D.H. (specifying con in August 2006).

took the victims' money and then spent it on rent, trips to Walmart, casinos, restaurants, and the like.  She never held a bridal show or printed a bridal magazine.

The scam was not easy to pull off.  It was extensive, professional, well-planned, well-organized, and sophisticated.

*The Bridal Scam Was Extensive*

The scam targeted 6 major cities.  She conned or tried to con around 200 victims.  PSR ¶ 43.  As soon as victims in one city became aware that they had been conned, Defendant started up a new one.  PSR ¶ 19.  For example, after her Boston con shut down, Defendant started conning people around Dallas-Ft. Worth only two weeks later. *Id.*  The only reason that Defendant did not rack up greater losses in more cities was her arrest.

*The Bridal Scam Was Professional, Well-Planned and Well-Organized*

Defendant could con so many professional small businesspeople because she ran a professional, well-planned, and well-organized con.  She acted like a professional.  PSR ¶ 15; *see also* Victim Impact Statements; *see especially* Victim Impact Statement of N.O.  She had victims sign professional-looking business contracts.  PSR ¶ 15; *see, e.g.,* Ex. C (Columbus Living Magazine, Buckeye Business Guide, and South Beach Bride contracts and agreements). Her business materials also looked professional.  *See, e.g.,* Ex. D (Baltimore's Bride tri-fold brochure), Ex. E (Dallas-Ft. Worth communications with Elegant Nuptials).  Some were created by other, unwitting, professionals that she had hired.  *See, e.g.,* PSR ¶¶ 35, 36, 40(b).  She used multiple identities, some stolen.  *See supra* note 1; PSR ¶¶ 17(b)-(c), 26, 27.  She convinced victims that she lived in the targeted cities by setting up virtual offices in those cities to receive mail or take messages.  PSR ¶ 15.  She used multiple websites, cellphone numbers, and e-mail

accounts. PSR ¶ 17(f). She "friended" multiple victims on Facebook, thus conning people into believing that she was part of the victims' trusted business and social networks. Victim Impact Statement of A.H.; Victim Impact Statement of J.A.A. On her Facebook page, Defendant convinced people of her legitimacy by deleting whistleblowers' posted complaints. When the whistleblowers complained about the deletions, Defendant deleted those complaints, too. PSR ¶ 29(a).

She was so professional, well-planned, and well-organized that she used her husband to open computer accounts and bank accounts, but, they claim, kept him ignorant that he was assisting a con for 3½ years! PSR ¶ 17(d) & n.1.

***The Scheme Became More Sophisticated as Defendant Learned from Her Mistakes***

Defendant was so professional, well-planned, and well-organized, that she learned from her mistakes. When the scam began, Defendant made the mistake of meeting people in person and running a scam where she lived. This made it easier for people to get law enforcement interested in her case, and required her to move away when detected.

Eventually, Defendant learned her lessons. She stopped using her real name. She ran her scams at a distance, using the Internet. She hid behind and exploited Facebook and Twitter, the latest in social media.

**III.  THE SCAM SERIOUSLY HURT SMALL BUSINESSPEOPLE BY TAKING THEIR TIME AND MONEY, DIVERTING THEIR FUNDS FROM PLACING REAL ADS THAT WOULD HAVE SUSTAINED THEIR BUSINESSES, REDUC-ING THEIR INCOMES, AND VIOLATING THEIR TRUST**

The bridal scam targeted small businesspeople, who had small incomes and very little to invest in advertising. In addition to losing the money they gave Defendant, they also lost the

additional time and expenses they spent to prepare for her shows, as well as the new business that they had counted on receiving.  Once conned, the victims often had no money to spend on legitimate advertising.  Many are afraid to advertise again, lest they be conned again.  Without advertisements, their businesses suffer.  Many of them could ill afford the losses.  Consider what just a small sample of the victims said:

- "I spent this money, in hopes of getting some 'side jobs' to supplement my husband[']s income.  While he works two jobs, a civilian job and also traveling with the Air National Guard every month, extra income was something that we could absolutely use to help with the bills, helping out my parents, just sustaining life.  Financially, any amount of money taken from my family hurts. [¶] Emotionally, I was just starting a business.  I got burned.  I don't trust any advertising means out there, which is obviously not helping my business at all."  Victim Impact Statement of A.L.H.R.

- "As for how this has effected [sic] me    well my husband and I are both self employed and broke.  I was hoping + praying to book a few weddings.  We have 2 kids    they are on Medicade [sic]    we have no insurance.  We probably qualify for food stamps but my husband is too proud. . . ."  Victim Impact Statement of J.A.A.

- "We did have to turn down a booking for Dec. 11, 2010 (with a possible $3195 income value) because of this.  We have not been able to book anything into those dates since becoming aware the bridal show was not happening."  Victim Impact Statement of J.D.B.

- " . . . I started to make more and more preparations for the event including speaking with an interior designer regarding ho to set up my booth and how I might want to decorate it.  I also spent quite a bit of time studying other wedding photographer's [sic] websites to get ideas for booth decoration and also to figure out how best to prepare for the show, since it would be my first.  I also was expecting to book a good chunk of my weddings for 2011 at this event and due to this lady's misleading actions I lost out on thousands upon thousands of dollars from potential business . . . ."  Victim Impact Statement of A.S.W.

- "She was devious in her responses and knew all the right things to say when I asked questions.  She even developed a bogus Facebook fanpage for [herself] and was friends with many other of my close friends in the

business so I would develop a trust for her even more.  I made many plans . . . Because of all this, I have not been able to trust in another bridal show since because I am scared of getting screwed again.  I am a small business owner and even a small amount of $585.00 can really hurt." Victim Impact Statement of A.H.

- "I can no longer fully trust new vendors, which vendor relationships [are] a large part of my industry to succeed. [¶]  The giveaways purchased were destroyed by not being used so long . . . . [¶]  Personally put in 20 or so hours a week over [a] few months to get ready for the wedding show, which made me turn down several portrait sessions and even two weddings so I can be 100% for this non-existing wedding show." Victim Impact Statement of A.S.O.

- "Emotionally, I cannot get over how I let Karen Tucker into my home with my children (when she came to pick up the check).  She sat at our table & talked to my kids.  I will <u>NEVER</u> trust someone again whom I don't know personally or business wise.  I have a mind set now that everything & everyone is a scam artist until they prove me different thanks to Karen Tucker." Victim Impact Statement of J.T.H.

- "By tying up scarce financial resources, this crime reduced my ability to operate my small music performance business.  The resulting loss of potential business customers has further reduced my available funds to invest in marketing." Victim Impact Statement of H.G.S.

- "We gave her one check for $950.00 and the second one for $900.00.  We have a budget of $2000 for the holidays.  Since the ad never went out we lost many customers causing the year end sales to be lower than usual.  After we were taken by Karen Tucker we hesitate to sign up with other advertiser's [*sic*] due to her dishonesty." Victim Impact Statement of A.T.

- "I was trying to build my make-up artist business in 2009 [because] I had just given birth to my first baby and wanted a way to make a great income while staying home with her.  I did not have a lot of money to invest in advertisements. . . . I was very sad because my family + I were already broke + struggling financially." Victim Impact Statement of M.C.

- "As a result of her fraudulent act and how late in the year I found out, I could not immediately sign up for any more Bridal Shows [sic].  The specials were over, the incentives offered had been given out to those who signed up earlier and the additional cost was totally out of my reach. . . . The worst part of this ordeal is that I feel like Karen Tucker['s] malicious

> scam stole my dignity and preyed on my innocence and transparency . . . the horrible thought of this even still brings me to tears each time I think about it." Victim Impact Statement of N.O.

## IV. DEFENDANT DESERVES NO BREAK BECAUSE OF HER CLAIMED BAD CHILDHOOD, MENTAL OR EMOTIONAL PROBLEMS, OR DIMINISHED CAPACITY

The Court should deny Defendant's request for leniency because of her claimed bad childhood, mental or emotional problems, or diminished capacity. These problems appear manufactured and to have little to do with the commission of the scam. Moreover, they illustrate why Defendant is likely to commit crimes again once she is released from prison.

*The "Problems" Appear Manufactured*

The record holds several clues that Defendant manufactured her claimed bad childhood, mental or emotional problems, or diminished capacity in order to escape a lengthy prison term.

The first clue is that although Defendant traces her problems to a rough childhood and later drug use, she never mentioned these problems for an earlier presentence report. As the PSR recounts, right before Defendant's last stint in prison, Nevada created a presentence report. PSR ¶ 63. Defendant now claims mental, emotional issues, and alcohol issues, but never reported these issues for the Nevada presentence report. PSR ¶¶ 114, 119.

Nor were these mere omissions or failures of memory. Defendant told the Probation Officer other misstatements. Defendant claimed to have completed a nursing program at a school that has no record of her ever attending. PSR ¶ 128. Defendant claimed that she was fired from a job in early 2007 after her employer conducted a criminal background check, but the employer said that she was terminated for fraudulent contracts. PSR ¶ 133. Defendant also denied having any liabilities, despite a credit report that lists almost $14,000 in debts in collec-

tion status.  PSR ¶ 140.

The forensic psychiatric evaluation that Defendant relies on has thin support.  First, the evaluation's main sources are not credible.  The evaluation rests largely upon a three-hour interview with Defendant, *see* Evaluation at 1    but Defendant is a con woman who tells people whatever suits her purpose.  Around 200 victims in this case took Defendant at her word, and see where it got them.  The evaluation also rests upon the supposedly independent corroboration of Defendant's sister.  *See* Evaluation at 1.  But Defendant's sister should be disbelieved because she repeatedly ignored the Probation Officer's attempts to interview her, PSR ¶ 95, and thus has not gone on record.

### *The "Problems" Don't Square with the Crime's Execution*

Second, the evaluation is internally incoherent.  On the one hand, the report concludes that her problems caused Defendant to be "unable to function effectively as a mother, spouse, employee, sister, or stable human being."  Evaluation at 7.  Yet somehow, at the same time Defendant could function "in a coherent, organized, and purposeful way" during her fraud.  *See* Evaluation at 5.  It begs disbelief that someone who was "unable to function effectively as a[n] . . . employee . . . or stable human" could function "in a coherent, organized, and purposeful way."  Consider the facts of this case: Defendant created, obtained, and used professional-looking contracts; professional-looking business materials; multiple bank accounts; multiple identities; virtual offices; multiple websites, cellphones, and e-mail accounts; and used current social media (Facebook and Twitter) to connive hundreds of people across the country.  She acted profession- ally and knew about the industry.  If her own husband did not know that she was having problems and making thousands of money from a con, how serious could her problems really

have been?

Finally, consider how unlikely it is that someone suffering from the problems that Defendant claims would turn to solace in a sophisticated con like Defendant's. A long-range business con that requires extensive planning is not usually the depressive substance abuser's crime of choice.

### V.   GOVERNMENT'S SENTENCING RECOMMENDATION AND GUIDELINES CALCULATIONS

The United States recommends incarceration at the low end of the Sentencing Guidelines range determined by the stipulations in the plea agreement; 36 months of supervised release; a fine within the Sentencing Guidelines range determined by the stipulations; restitution as set forth in the agreement; forfeiture; and a $200 mandatory special assessment. *See* Plea Agreement ¶ 4, at 5. The calculations and rationale are set forth below.

***The Calculations***

The United States calculates the Sentencing Guidelines range as follows:

**U.S.S.G. § 2B1.1 (Larceny, Embezzlement, Etc.)**

| | | |
|---|---|---|
| (a)(1) | Base offense level for statutory maximum of 20 years or more | 7 |
| (b)(1)(E) | Loss between $70,000 and $120,000[3] | 8 |
| (b)(2)(B) | 50 or more victims, but fewer than 250 | 4 |
| (b)(9)(C) | Sophisticated means | 2 |
| **TOTAL** | | **21** |
| **TOTAL ADJUSTED FOR ACCEPTANCE OF RESPONSIBILITY** | | **18** |

---

[3] This reflects the amount of loss known to the United States at the time it entered the plea agreement.

**GUIDELINE RANGE - CRIMINAL HISTORY CATEGORY IV        41-51 mos.**

*Count 2:  Aggravated Identity Theft (18 U.S.C. § 1028A)*

**U.S.S.G. § 2B1.6 (Aggravated Identity Theft)**

    (a)    Apply the statutory 2-year term of imprisonment, consecutive to other term of imprisonment

*See* Plea Agreement ¶ 3, at 2-3.

Combining the sentences for Counts 1 (41 months) and 2 (24 months) yields a sentence of 65 months.

*Recommendation*

The United States therefore recommends a sentence of 65 months in prison; 36 months of supervised release; a fine of $10,000 (because although Defendant appears unable to pay a fine at the present time, she may become able to do so in the future with an installment schedule); restitution to the victims for $116,713.62, PSR ¶ 164; forfeiture of the same amount; and a $200 special assessment.

*The Recommendation is Reasonable and Necessary for Penal Purposes*

A 5½-year sentence is reasonable and necessary to punish defendant; to incapacitate her from committing crimes while she is in prison; to deter her from returning to a life of crime after she leaves prison; and to deter like-minded Internet con artists.

Defendant should be punished because she profited off the backs of small businesspeople whose families needed the money, making these victims sick, disgusted, embarrassed, and shocked at her behavior.  (For example, Defendant stole money from one woman after sitting across the table from the woman's children.)  By taking their money, she affected the industry by

making her victims less likely to do business with other, legitimate advertisers.

Defendant should be incapacitated because her criminal past shows that when she is out of prison, she steals. She pauses between crimes only briefly. Maybe a few years elapse, but then she is back at it.

Defendant needs specific deterrence because her earlier, shorter sentences have not stopped her. Even multi-year sentences have not worked. She served them, went free, and then committed more crimes. Moreover, giving Defendant only 36 months, as she requests, would go backwards. She has received sentences in this range before. A low sentence will not catch her attention. Only escalating the punishment, if anything, will.

Finally, the recommended sentence is necessary for general deterrence. Technology allows people to con others at a distance over the Internet and in relative anonymity. It is hard to convince law enforcement to take on these investigations, because they involve many people who each lost around $1,000, in various locations. Like-minded con men and women need to know that they will be caught, and when caught, punished severely.

**CONCLUSION**

After a lifetime of crime, Defendant hit the big time. She should be sentenced accordingly. Defendant's request, 36 months, is too low for a crime of this size, scope, and duration; that involved this much planning and coordination; and that harmed so many people in so many ways. Defendant's request is also too low given her criminal history and the likelihood that she will commit more crimes once she is released from prison.

The appropriate sentence is 65 months.

                                 Respectfully submitted,

                                 CARMEN M. ORTIZ
                               United States Attorney

                      By:   */s/ Scott L. Garland*
                               Scott L. Garland
                               Assistant U.S. Attorney

Date:   March 14, 2011

## CERTIFICATE OF SERVICE

I hereby certify that these documents, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                    By:   */s/ Scott L. Garland*
                               Scott L. Garland
                               Assistant U.S. Attorney

Date: March 14, 2011